UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
SECURITIES INVESTOR PROTECTION          :
CORPORATION,                            :          Adv. Proc. No. 08-01789 (SMB)
                                        :
          Plaintiff,                    :          SIPA LIQUIDATION
                                        :
          v.                            :          (Substantively Consolidated)
                                        :
BERNARD L. MADOFF INVESTMENT            :
SECURITIES LLC,                         :
                                        :
          Defendant.                    :
-------------------------------------------------------X
                                        :
In re:                                  :
                                        :
BERNARD L. MADOFF,                      :
                                        :
          Debtor.                       :
-------------------------------------------------------X
                                        :
IRVING H. PICARD, Trustee for the       :
Liquidation of Bernard L. Madoff Investment :
Securities LLC,                         :
                                        :
          Plaintiff,                    :          Adv. Proc. No. 10-05345 (SMB)
                                        :
          v.                            :
                                        :
CITIBANK, N.A., CITICORP NORTH          :
AMERICA, INC., and CITIGROUP GLOBAL     :
MARKETS LIMITED,                        :
                                        :
          Defendants.                   :
-------------------------------------------------------X

## MEMORANDUM DECISION DENYING TRUSTEE'S
## MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

**A P P E A R A N C E S :**

BAKER & HOSTETLER LLP
*Attorneys for Irving H. Picard, Trustee*
45 Rockefeller Plaza
New York, NY 10111

> David J. Sheehan, Esq.
> Seanna R. Brown, Esq.
> Matthew D. Feil, Esq.
> Andres A. Munoz, Esq.
> Chardaie C. Charlemagne, Esq.
>      Of Counsel

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
*Attorneys for the Defendants*
One Liberty Plaza
New York, NY 10006

> Carmine D. Boccuzzi, Jr., Esq.
> Pascale Bibi, Esq.
>      Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge**

Plaintiff Irving H. Picard ("Trustee"), the trustee for the liquidation of Bernard L.

Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection

Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA") seeks to recover $343,084,590 in subsequent

transfers made to Defendants Citibank, N.A. ("Citibank") and Citicorp North America,

Inc. ("Citicorp") made by a BLMIS feeder fund.[1]  He has moved ("Motion") for leave to

file and serve a *Proposed Amended Complaint*, dated Dec. 14, 2018 ("*PAC*")[2] (ECF Doc.

# 150-1).[3]  Defendants oppose the Motion.  (*Memorandum of Law in Opposition to*

---

[1]      Citigroup Global Markets Limited ("CGML") is also joined as a defendant but Exhibit C attached to the Proposed Amended Complaint does not list any subsequent transfers to CGML..

[2]      *See Memorandum of Law in Support of Trustee's Motion for Leave to File an Amended Complaint* ("*Trustee Memo*"), dated Dec. 14, 2018 (ECF Doc. # 149); *see also Reply Memorandum of Law in Further Support of Trustee's Motion for Leave to File an Amended Complaint*, dated May 7, 2019 ("*Trustee Reply*") (ECF Doc. # 162).  The *PAC* is attached as Exhibit A to the *Declaration of Seanna R. Brown in Support of the Trustee's Motion for Leave to File an Amended Complaint*, dated Dec. 14, 2018 ("*Brown Declaration*") (ECF Doc. # 150).

[3]      "ECF Doc. # _" refers to documents filed on the docket of this adversary proceeding.  References to other dockets include the case number.

*Trustee's Motion for Leave to File an Amended Complaint*, filed Mar. 29, 2019

("*Opposition*") (ECF Doc. # 158).)  For reasons that follow, the Motion is denied.

## BACKGROUND

The background information is derived from the well-pleaded factual allegations

of the *PAC* and other information the Court may consider in determining whether the

pleading is legally sufficient.

### A.    The Ponzi Scheme

At all relevant times, Bernard Madoff operated the investment advisory arm of

BLMIS as a Ponzi scheme.  (¶ 79.)[4]  Beginning in 1992, Madoff told investors that he

employed the "split-strike conversion" strategy ("SSC Strategy"), under which BLMIS

purported to purchase a basket of stocks intended to track the S&P 100 Index, and

hedged the investments by purchasing put options and selling call options on the S&P

100 Index.  (¶¶ 85, 87.)  In reality, BLMIS never purchased any securities on behalf of its

investors and sent monthly statements to investors containing falsified trades typically

showing fictitious gains.  (¶¶ 85, 86.)  All investor deposits were commingled in a

JPMorgan Chase Bank account held by BLMIS, and the funds were used to satisfy

withdrawals by other investors, benefit Madoff and his family personally, and prop-up

BLMIS's proprietary trading department.  (¶ 85.)

The BLMIS Ponzi scheme collapsed when redemption requests overwhelmed the

flow of new investments, (¶ 101), and Madoff was arrested by federal agents for criminal

---

[4]    References to paragraphs in the *PAC* will be denoted as "(¶ _ )," except where overt reference to
the *PAC* is necessary to avoid confusion.

violations of federal securities laws on December 11, 2008 ("Filing Date").  (¶ 17.)  The
Securities and Exchange Commission ("SEC") contemporaneously commenced an
action in the United States District Court for the Southern District of New York, and that
action was consolidated with an application by the Securities Investor Protection
Corporation ("SIPC") asserting that BLMIS's customers needed the protections afforded
by SIPA.  (¶¶ 17, 18.)  On December 15, 2008, the District Court granted SIPC's
application, appointed the Trustee and his counsel, and removed the SIPA liquidation to
this Court.  (¶ 19.)

At a plea hearing on March 12, 2009, Madoff pleaded guilty to an eleven-count
criminal information and admitted that he "operated a Ponzi scheme through the
investment advisory side of [BLMIS]."  (¶¶ 22, 102.)

**B.    Defendants and Relevant Affiliates**

Citibank is a commercial bank with it principal place of business in New York,
and is a wholly-owned subsidiary of Citigroup, Inc. ("Citigroup").  (¶ 29.)  Citicorp is a
non-bank holding company registered in Delaware and an indirect subsidiary of
Citigroup.  (¶ 37.)  Citibank uses Citicorp to book and assign capital for leveraged and
bridge loans.  (¶ 37.)  Non-party Citigroup Global Markets, Incorporated ("CGMI") is an
indirect, wholly-owned subsidiary of Citigroup whose focus and expertise relate to
derivative products, including exchange-listed ("OEX") and over-the-counter ("OTC")
options.  (¶¶ 52, 59.)  Defendants conducted their BLMIS-related business and diligence
primarily through CGMI.  (¶¶ 5, 107.)  Non-party CAFCO, LLC ("CAFCO"), a wholly-
owned subsidiary of Citigroup, is a conduit commercial lender.  (¶ 58.)

- 4 -

**C.      The Fairfield Deal – Deal No. 1**

On April 28, 2005, CGML entered into an offshore swap transaction with Auriga International Limited ("Auriga"), a British Virgin Islands hedge fund that invested almost all its assets with Fairfield Sentry Limited ("Fairfield Sentry").  Auriga provided CGML with $140 million in collateral in return for leverage that would allow Auriga to recover two-times the returns on a hypothetical direct investment in Fairfield Sentry ("Fairfield Deal").  (¶¶ 72, 105, 106.)  To generate the returns it might have to pay Auriga, CGML invested the $140 million in collateral plus an equivalent amount of its own funds, directly in Fairfield Sentry, (¶ 106), effecting a "perfect hedge."  *See Picard v. ABN AMRO Bank (Ireland) Ltd.* (*In re BLMIS*), 505 B.R. 135, 138 (S.D.N.Y. 2013).  The investment by CGML of an equal amount of its own funds provided it with protection if the Fairfield Sentry investment increased in value and required CGML to pay two times the returns.  In the meantime, CGML earned fees.  (¶ 106.)

CGMI's Global Hybrid Trading Desk summarized the proposed terms of the Fairfield Deal in a March 10, 2005 internal memorandum.  ("*March 10 Memo*").[5]  (¶ 111.)  The *March 10 Memo* also detailed the SSC Strategy and attached a due diligence questionnaire for its investors prepared by Fairfield Sentry's operator, Fairfield Greenwich Group ("FGG"), that claimed BLMIS executed its options trades on the OTC market.  (¶¶ 112, 116; *see also March 10 Memo* at ECF pp. 4, 7-42 of 132.)[6]

---

[5]      The *March 10 Memo* is filed as Attachment A to the *Letter from Seanna R. Brown*, dated July 23, 2019 ("*Brown (7/23) Ltr.*") (ECF Doc. # 167-1).

[6]      "ECF p. _" refers to the page number imprinted on the top of the page by the Court's electronic filing system.

### 1.    CGMI's Due Diligence

Diligence for the Fairfield Deal was spearheaded by CGMI, specifically Samir Mathur, a managing director, and Rajiv Sennar, an employee in the Fund and Multi-Asset Derivatives Group.  (¶ 107.)  CGMI could not verify BLMIS's option transactions or identify the relevant options counterparties which, together with BLMIS's lack of an independent custodian, "concerned" CGMI.  (¶¶ 108, 110.)  On March 11, 2005, Marc Fisher told FGG's Kim Perry that Citibank was afraid the assets in Fairfield's BLMIS account could disappear.  (¶ 118.)  An internal FGG email from Perry relayed Citibank's "credit concerns" that "the money [could] disappear from the account in any one day," and advised that Citibank "would feel more comfortable if there were some sort of control on money leaving the account."  (¶ 118.)  Citibank's main concern, according to Perry, was the lack of an independent custodian to prevent BLMIS from stealing Fairfield Sentry's assets.  (¶ 119.)  On or around March 22, 2005, Fisher, Mathur, Ramesh Gupta and other CGMI employees visited Fairfield's New York office for further diligence.  Two days later, Fisher advised FGG (Perry) that Citibank had lingering concerns about the "theoretical fraud risk given that Madoff is the custodian of the assets," but Perry nonetheless informed his Fairfield colleagues that Citicorp's trading head agreed to assume the risk and the final "senior sign-off" was a mere formality.  (¶ 120.)

CGMI asked Fairfield to arrange a meeting with BLMIS before finalizing the Fairfield Deal because "the more [Citibank] could find out more directly it's better," but Fairfield explained that a meeting was not possible.  (¶ 123.)  In lieu of a meeting, Mathur asked Fairfield for public information about BLMIS that he could distribute to

the CGMI credit committee to help consummate the deal.  (¶ 124.)  But the information did not alleviate CGMI's concerns.  (¶ 125.)  On March 30, Mathur requested a telephone call with Amit Vijayvergiya, Fairfield's Head of Risk Management, to discuss CGMI's concerns that BLMIS was not making options trades it purported to make and that the money under Madoff's control could disappear.  (¶ 126.)  According to Vijayvergiya, CGMI wanted to revisit (1) whose name the stock/option positions were held in at the Depository Trust and Clearing Corporation; (2) what happens to the assets in event of bankruptcy; (3) the name of BLMIS's accountant; and (4) the number of option counterparties.  (¶ 127.)

On March 30, 2005, CGMI's Global Hybrid Trading Desk issued a memorandum ("*March 30 Memo*") to the Fast Track Capital Markets Approval Committee, whose purview was reviewing structured financing products and identifying risks.  (¶¶ 128-130.)[7]  The *March 30 Memo* stated that "[t]here should be no counterparty risk associated with this transaction.  There is a fraud risk" but did not amplify the nature of the fraud or the risk.  (*March 30 Memo* at ECF p. 8 of 28.)  The memo also noted that "Madoff is both Prime Broker and Custodian of the SSC assets of Sentry."  (¶ 131; *March 30 Memo* at ECF p. 7 of 28.)

### 2.    CGMI's Quantitative Analysis

CGMI also performed a quantitative analysis ("Quantitative Analysis"), circulated internally with the *March 10* and *March 30 Memos*, that compared BLMIS's stated

---

[7]      The *March 30 Memo* is filed as Attachment B to the *Brown (7/23) Ltr*. (ECF Doc. # 167-2).

investment returns to the returns that an SSC Strategy would be expected to yield. (¶¶ 136, 137.)[8]  The Quantitative Analysis showed that from December 1990 through January 2005 ("Sample Period"), BLMIS stated positive returns for Fairfield in 164 out of 170 months.  (¶¶ 137, 142.)  By contrast, the S&P 100 Index posted positive returns in only 107 months in the Sample Period.  (¶ 143.)  The Quantitative Analysis revealed that BLMIS outperformed the S&P 100 across a number of metrics and that Fairfield's returns were superior to the S&P 100 Index even though the SSC Strategy presumptively had the same risk profile as the S&P 100 Index.  (¶¶ 145, 146, 149, 150-153.)

### 3.    Leon Gross's Analysis[9]

Leon Gross, a managing director at CGMI, also ran an analysis of BLMIS's SSC Strategy ("Gross Analysis"), at the behest of a CGMI customer, Harry Markopolos.  (¶ 155.)[10]  Markopolos asked Gross to analyze BLMIS's returns and determine whether the data was possible given BLMIS's purported SSC Strategy.  (¶¶ 155, 159-60.)[11]  The Gross

---

[8]    The Quantitative Analysis is attached to the *March 30 Memo* at ECF pp. 9-28 of 28 and is entitled "Risk Analysis."  The Quantitative Analysis is captured in a spreadsheet entitled "Fairfield Analysis.xls." (*See March 30 Memo* at ECF p. 6 of 28.)

[9]    The *PAC* does not state when Gross made the analysis discussed in the succeeding text.  However, its placement in the *PAC* suggests that it was done around the time that CGMI was conducting its due diligence in connection with the Fairfield Deal.

[10]    According to the Trustee's counsel, the Gross Analysis was never reduced to writing.  However, Gross confirmed at his Rule 2004 examination that he did in fact analyze BLMIS's returns under circumstances resembling those described in the *PAC*.  (*Rule 2004 Examination of Leon J. Gross*, dated Oct. 22, 2010, at 34:8-18 ("*Gross Tr.*").)  Excerpts of the transcript are attached as Exhibit F to the *Declaration of Carmine D. Boccuzzi, Jr. in Opposition to Trustee's Motion for Leave to File an Amended Complaint*, filed Mar. 29, 2019 ("*Boccuzzi Declaration*") (ECF Doc. # 157).

[11]    In Markopolos' s November 2005 submission to the SEC accusing BLMIS and Madoff of fraud, Markopolos identified Gross as a derivatives expert the SEC should interview.  (¶¶ 169-70.)  Markopolos also emailed Gross in June 2007 asking if Gross had heard anything about the imminent collapse of Madoff's Ponzi scheme.  (¶ 174.)

Analysis considered six or seven scenarios that weighed different variables (*e.g.*, market timing, buying or selling individual options, etc.) in an attempt to replicate BLMIS's returns. (¶¶ 162-63.) Gross concluded that "either the returns are not the returns or the strategy is not the strategy." (¶ 155; *Gross Tr.* at 116:13-14.)   He was "skeptical that [the SSC Strategy] as described could generate those returns," but attempted to "reconcile" the "discrepancy between the strategy and the returns . . . ." (¶ 161.) Gross determined "that the returns weren't generated by the strategy, they were either generated by something else – that something was amiss there." (¶ 164; *Gross Tr.* at 35:19-22.) Gross also asked traders at CGMI's index options desk if they were familiar with Madoff trading index options—none were. (¶¶ 165-166.)[12]

Despite these numerous "concerns," the Fairfield Deal closed and CGML invested $140 million of its own funds.

**D.    Prime Fund Deal – Deal No. 2**

CGMI began negotiating the terms of a $300 million revolving credit facility ("Prime Fund Deal") with Tremont Partners, Inc. ("Tremont") in March 2005. (¶ 175.) Tremont served as the general partner and investment advisor to several BLMIS feeder funds (collectively, the "Rye Funds"), including the Rye Select Broad Market Prime Fund, L.P. ("Prime Fund"), and was liable for their debts under Delaware law. (Complaint, dated Dec. 7, 2010 ("*Tremont Complaint*"), at ¶¶ 47-48, 61-62 (ECF Adv.

---

[12]    The *PAC* alleges that Gupta made similar inquiries with respect to BLMIS's counterparties and that Gupta knew Gross, but there is no allegation that Gupta and Gross coordinated efforts or shared any findings with respect to BLMIS.  (*See* ¶ 167.)

Pro. No. 10-05310 Doc. # 1.))[13]  In addition, Tremont managed, advised and/or oversaw
a group of sub-feeder funds that invested with BLMIS through the Rye Funds.
(*Tremont Complaint* ¶ 66.)  The Funds invested close to 100% of their assets with
BLMIS, (*Tremont Complaint* ¶ 8), and Tremont earned substantial fees acting as their
investment manager.  (*Tremont Complaint* ¶¶ 104-08.)  The parties contemplated that
Prime Fund would use all or substantially all of the funds it borrowed from Citibank to
invest with BLMIS.  (¶ 178.)

### 1.    Tremont Indemnity

According to the *PAC*, CGMI's approval of the Prime Fund Deal was contingent
on an agreement to indemnify Defendants and CAFCO against fraud by BLMIS and
specifically, to ensure that the Defendants and CAFCO would be repaid if BLMIS
misappropriated Prime Fund's assets or was not trading securities.  (¶ 177.)  Before
entering into the Prime Fund Deal, Defendants conducted substantial due diligence as
reflected in the *Transaction Memo*, dated May 31, 2005 ("*Transaction Memo*").[14]
Defendants acknowledged the risk of fraud because BLMIS maintained physical control
of Prime Fund's account and had full discretion over account activity, (*Transaction
Memo* at 5), but viewed the risk as "remote," (*id.* at 2), and noted BLMIS's "strong
industry reputation with over 40 years experience, over $500 million in capital, its
responsibilities and obligations as a registered broker-dealer, and its historical
relationship with Tremont and, more recently, Citigroup."  (*Id.* at 3.)  BLMIS had
managed Prime Fund's assets since 1997, and although BLMIS was not contractually

---

[13]    The *PAC* incorporates by reference the factual allegations in the *Tremont Complaint*.  (¶ 261.)

[14]    A copy of the *Transaction Memo* is annexed as Exhibit C to the *Boccuzzi Declaration*.

required to adhere to its SSC Strategy, the failure to do so would be an event of default that would likely lead to Tremont's redemption of its BLMIS investment. "Given its historical track record of maintaining the Investment Strategy since inception of the Fund, it appears remote that the Investment Advisor would deviate from the Investment Strategy." (*Id.* at 2.)

However, the Defendants viewed certain guarantees by Tremont (the "Tremont Indemnity") and Tremont Capital Management, Inc. ("TCM") (the "Parent Guarantee"), Tremont's parent, as the "primary mitigant of fraud" by BLMIS.[15] (*Id.* at 3.) Under the Tremont Indemnity, Tremont agreed to answer for the debts of Prime Fund, and under the Parent Guarantee, TCM agreed to guarantee the timely payment of Tremont's obligations with the exception of the obligation to support Prime Fund's repayment of advances as a result of a decline in the market value of the assets purchased in adherence to the SSC Strategy. (*Id.* at 2, 7.) Tremont, as Prime Fund's general partner, was liable anyway for all of Prime Fund's debts, but the Tremont Indemnity would permit the Defendants to proceed directly against Tremont without first exhausting its remedies against Prime Fund as required by Delaware law. (*Id.* at 6-7 (citing DELAWARE REVISED UNIFORM LIMITED PARTNERSHIP ACT ("RULPA") § 17-403).)

### 2. Oppenheimer Proviso

TCM, Tremont's parent, was a wholly-owned subsidiary of Oppenheimer Acquisition Corp., the parent of Oppenheimer Funds, Inc. (collectively, "Oppenheimer" or "OFI"). (*Transaction Memo* at 2.) Oppenheimer was a majority owned subsidiary of

---

[15]    CGMI also required Prime Fund to pledge its assets as collateral for the *RCA.* (¶ 206.)

Massachusetts Mutual Life Insurance Company.  Mass Mutual had a AAA rating from

S&P and an Aa1 rating from Moody's.  (*Id.* at 3.)  In addition to the Tremont Indemnity

and the Parent Guarantee, TCM had to remain a wholly-owned subsidiary of

Oppenheimer.  (*Id.*)  CGMI's Marc Adelman noted just days before the *RCA*[16] was

executed that Tremont's relationship with OFI was a material component of the deal

and that CGMI "would want the right to reconsider that if Tremont were no longer an

affiliate of OFI."  (¶ 185.)  However, the *PAC* does not allege that Oppenheimer

guaranteed the obligations of Prime Fund, Tremont or TCM incurred in connection with

the Prime Fund Deal.

On June 15, 2005, Defendants Citibank and Citicorp as lenders and CAFCO as

conduit lender on the one hand, and Prime Fund as borrower and Tremont, as General

Partner, on the other, entered into the *RCA*.  The *RCA* granted Prime Fund a revolving

credit facility in the sum of $300 million to be invested with BLMIS.  The *PAC* does not

allege and there is no evidence that the Defendants received the Parent Guarantee.

## E.    Proposed Tremont Deal – Deal No. 3

Tremont emailed CGMI in December 2005 to explore another Madoff-related

deal in which Defendants would own shares directly in a Tremont feeder fund in

exchange for approximately $300 million in leveraged financing ("Proposed Tremont

Deal").  (¶¶ 187-88, 201.)

---

[16]    "*RCA*" refers to the *Revolving Credit and Security Agreement among American Masters Broad Market Prime Fund, L.P. as Borrower, Tremont Partners, Inc. as General Partner, CAFCO, LLC as Conduit Lender, Citibank, N.A. as Secondary Lender and Citicorp North America, Inc. as Agent, dated as of June 15, 2005*.  The *RCA* is attached as Exhibit A to the *Boccuzzi Declaration*.

### 1.    CGMI's Initial Due Diligence

CGMI's Matthew Nicholls, along with Mathur and Sennar, were involved in diligence efforts for the Proposed Tremont Deal.  (¶ 190.)  On January 30, 2006, Sennar reminded Tremont's Darren Johnston via email that any deal was contingent upon "address[ing] the due diligence questions our internal control functions have."  (¶ 191.)  By February 2006, CGMI and Tremont had held several conference calls and at least two due diligence sessions to discuss CGMI's concerns about fraud surrounding the Proposed Tremont Deal but Tremont was unable to satisfy CGMI that BLMIS maintained segregated customer accounts or that the assets even existed.  (¶ 192.)  On February 16, Tremont sent Sennar a copy of the Prime Fund Pledge Agreement between Prime Fund and Citicorp that purported to show, along with Johnston's explanatory email, that Prime Fund's BLMIS account was held as a segregated customer account, but did not otherwise provide any other form of independent verification.  (¶¶ 193-94.)  On February 27, Johnston, Tremont CEO Robert Schulman, and CGMI's Sennar participated in a phone call to discuss BLMIS's custody of Prime Fund's assets and internal controls to prevent fraud or misappropriation of assets.  (¶ 195.)  After the call, Johnston forwarded copies of an "Independent Auditors' Report on Internal Control" and BLMIS's "Statement of Financial Condition" prepared by BLMIS's auditors, Friehling & Horowitz ("F&H") but the reports did not concern BLMIS's investment advisory business or explain whether BLMIS segregated customer assets in the customer accounts.  The reports "did not quell CGMI's fraud concerns."  (¶ 196.)

CGMI continued to inquire about Madoff's options trading but was unable to confirm from its due diligence starting in March 2005 and continuing through 2006

that it actually took place.  (¶¶ 197-98.)  Mathur knew that BLMIS purported to execute

billions of dollars of S&P 100 Index options trades as part of the SSC Strategy, but

CGMI's trading desk informed Mathur that it had "not been counterparties to these kind

of options, and they did not know of anybody else who would be the counterparties for

these kind of options."  (¶ 199.)  CGMI "agreed to seek a meeting directly with Madoff in

an attempt to resolve CGMI's long-standing concerns of fraud at BLMIS."  (¶ 201.)

In March 2006, CGMI identified discrepancies between certain October 21, 2005

options prices that BLMIS had reported to Fairfield Sentry and those reported by

Bloomberg.  (¶ 202.)  On March 23, 2006, CGMI's Vishal Mishra asked Vijayvergiya of

Fairfield about the discrepancies, leading to a telephone call and subsequent requests to

both FGG and Tremont for records of BLMIS's options transactions.  (¶¶ 202-203.)

CGMI also asked Fairfield for one or two names of counterparties that traded options

with BLMIS and inquired about a visit to FGG's offices to inspect options trade

confirmations from BLMIS.  (¶ 203.)  An internal Tremont email indicates that

Defendants asked Tremont to identify BLMIS's counterparties after they were unable to

"find anyone who admits to being a counterparty."  (¶ 204.)

Citibank later received the results of a KPMG Independent Accountants' Report,

dated April 17, 2006 ("KPMG Report"), required in connection with the Prime Fund

Deal for the purpose of valuing the collateral securing the *RCA*.  (¶ 206.)[17]  Among other

things, the KPMG Report featured a "Portfolio Data Integrity Test"; it selected twenty-

five securities at random from Prime Fund's BLMIS portfolio and compared BLMIS's

---

[17]     The KPMG Report is attached as Attachment D to the *Brown (7/23) Ltr.* (ECF Doc. # 167-4).  It is
not alleged when Citibank received the results of the KPMG Report.

reported transaction prices for those securities on October 31, 2005 and December 31, 2005 to the prices reported by Bloomberg and Interactive Data Corporation ("IDC") for those dates. (¶ 207; KPMG Report at 1.) The Portfolio Data Integrity Test flagged a number of discrepancies in Prime Fund's records, including a U.S. Treasury Bill with an incorrect maturity date, an option security—"Viacom Inc-B"— that was not a component of the OEX index and several differences between the market prices of trades listed on Prime Fund's records and the independent market prices reported by IDC or Bloomberg. (KPMG Report at 2-3.)

On April 18, Mishra emailed Vijayvergiya, copying Mathur and Gupta, to outline discussion topics for an upcoming April 20 meeting with FGG. (¶ 208.) First, CGMI sought to confirm options with counterparties; it had not seen any documents that identified the counterparties. (¶¶ 210-13.) Second, CGMI wanted the auditor's verification of OTC options details with counterparties and verification of the presence and segregation of securities and option trades in Fairfield's BLMIS account. (¶ 214.) CGMI also sought records from PricewaterhouseCoopers LLP ("PWC"), Fairfield's auditor, "to make sure that those securities exist or the options exist in that particular account." (¶ 215.) According to CGMI's Mathur, the April 20th Meeting "did not raise any new flags," but "did not give us [CGMI] the answer we were looking for." (¶ 216; *see also* ¶ 213 ("Mathur testified, '[we] never got to know who the eventual counterparties are on the options. So that part never got resolved.'") (alterations in original).)

### 2.    Meeting With Madoff

On December 20, 2005, a Tremont employee had emailed Tremont's CEO, Robert Schulman, noting that Citibank wanted "an initial DDQ meeting" and

subsequent update meetings with Madoff.  (¶ 189.)  With respect to "[w]hat type of

access" Citibank could have to Madoff, Schulman responded, "[c]an't do it."  (¶ 189.)

CGMI pursued the due diligence described in the preceding section and on March 27,

2006, Tremont's Johnston emailed Schulman regarding CGMI's request to meet with

Madoff.  (¶ 219.)  The email explained that the identity of BLMIS's counterparties was a

"critical issue" from CGMI's perspective and discussed Defendants' efforts to close the

loop on BLMIS's options counterparties:

> [A] new hire from Credit Suisse did not know of trades and they have even
> asked around a little trying to find out.  They mentioned trying to get proof
> such as a sample confirm or even talking to the counterparty if they are
> unable to find out directl[y].

(¶ 219.)

Tremont first refused to arrange the meeting but eventually, a meeting between

CGMI personnel and Madoff was scheduled for April 26, 2006 at BLMIS.  (¶ 221.)

However, shortly after the April 20th meeting at Fairfield, CGMI informed Tremont that

it would not go forward with the Proposed Tremont Deal, citing "insurmountable"

concerns of fraud with BLMIS.  (¶¶ 224, 225.)  Tremont's Darren Johnston documented

CGMI's concerns in an internal email, identifying the two "fundamental roadblocks" to

closing the deal:  Madoff's custody of the account and the lack of transparency regarding

how Madoff executed his volume of options.  (¶ 226.)

The Proposed Tremont Deal was never consummated and fell through in April

2006.

**F.      Subsequent Dealings With Tremont**

After the Proposed Tremont Deal fell through, Johnston emailed Schulman to

reiterate CGMI's continued enthusiasm for the Prime Fund Deal, (¶ 229), which was set

to expire on June 13, 2006.  (¶ 232.)   Tremont wanted to increase the size of the facility

from $300 million to $450 million and CGMI agreed to consider the proposal along

with a one-year renewal of the Prime Fund Deal subject to another credit due diligence

review that CGMI expected it could "comfortably" wrap up in two to four weeks.  (¶¶

236-38.)  As part of the diligence, Defendants requested Tremont's 2004 and 2005

audited financial statements.  (¶ 238.)  However, Tremont did not yet have the

requested financial statements.  (¶ 239.)  An internal May 9, 2006 Tremont email noted,

"Citi [was] concerned about the delay in the 2004 audited financials."  (¶ 239.)  Tremont

did send along its unaudited financials to CGMI, but acknowledged that CGMI was

"becoming increasing uncomfortable" and "very unsettled that the 2004 audit is not yet

completed."  (¶ 240.)

**1.      Madoff Meeting**

According to the *PAC*, CGMI had "already concluded there was a high probability

of fraud at BLMIS," (¶ 231), and refused to meet with Madoff or confirm its "suspicions,"

(¶¶ 232, 233), because it might jeopardize the Fairfield and Prime Fund Deals.  In

particular, CGMI might lose a minimum profit of $8 million on the Fairfield Deal if the

deal was terminated.  (¶¶ 231-33.)  In June 2006, CGMI nevertheless expressed renewed

interest in meeting with Madoff.  (¶¶ 241-42.)  An internal Tremont email explained that

CGMI had not relaxed its demand for Tremont's audited financials and was "now

seeking a Madoff meeting." (¶ 242.)  CGMI wanted to "'resolve internal wonder' [sic] remaining from their due diligence related to 3X leverage on how Madoff executes the trades." (¶ 243.)  After CGMI followed up with Tremont in September about the meeting request, Tremont advised CGMI to prepare a list of proposed questions to Madoff for Tremont's review but would not commit to arranging a meeting.  (¶ 244.)  On October 11, CGMI's Matthew Nicholls sent Tremont a proposed agenda ("*Agenda*").[18]  (¶ 245.)  The *Agenda* did not expressly focus on BLMIS's options trades or assets.  (¶ 245.)  CGMI's focus was "the competitive environment," "key financial and business risks facing [BLMIS]" and other high-level overview issues.  (¶ 248.)  CGMI's Nicholls further explained that the *Agenda* "essentially boils down to a corporate overview."  (¶ 248.)

On November 27, 2006, CGMI met with Madoff at BLMIS's offices.  (¶ 251.)  Representing CGMI were Thomas Fontana, Bruce Clark and Nicholls, all of whom, the Trustee alleges on information and belief, had a direct economic interest in renewing and increasing the Prime Fund Deal.  (¶¶ 250-51.)  Shortly after the meeting with Madoff, the Prime Fund Deal was renewed for one month from November 30, 2006 to December 29, 2006, and later to December 13, 2007 and increased to $400 million.  (¶ 252.)

### 2.    Defendants Terminate the Prime Fund Deal

In October 2007, two months before the Prime Fund Deal was set to expire, Tremont proposed new terms that would "eradicate" the Tremont Indemnity without which Defendants and CAFCO's recovery in the event of fraud at BLMIS would be

---

[18]    The *Agenda* is attached as Exhibit B to the *Boccuzzi Declaration*.

limited to Prime Fund's assets.  (¶ 254.)  An internal Tremont email, dated November 7, 2007, reflected that negotiations between CGMI and Tremont were breaking down over a "limited recourse issue;" that is, Tremont's demand to remove the Tremont Indemnity from the *RCA* and insert a provision stating that Defendants and CAFCO would have "no recourse" against Tremont for Prime Fund's obligations.  (¶ 255.)  The parties renewed the Prime Fund Deal for three months on December 13, 2007, but could not agree on the continuation of the Tremont Indemnity.  (*See* ¶¶ 256-58.)  A March 10, 2008 internal Tremont email noted that "Citi needs indemnification from manager fraud."  (¶ 258.)

Tremont and Citibank could not break the impasse, and on March 12, 2008, Tremont informed CGMI that it would repay the loan on March 26, five days before the March 31 expiration date.  (¶ 259.)  On March 25, 2008, Prime Fund withdrew $475 million from its BLMIS account and transferred $301 million to Defendants the next day.  (¶ 260.)  The parties executed a termination agreement on March 26.

## G.    Allegations Against Tremont

On December 7, 2010, the Trustee filed a complaint against Tremont and several Tremont funds, including Prime Fund, to avoid and recover $2.1 billion of initial transfers from BLMIS.  The substance of the allegations included in the *Tremont Complaint* and supplemented by the *PAC* is that Tremont knew that BLMIS was not trading securities and was operating a Ponzi scheme.  In light of the Court's determination, I assume that the Trustee has adequately pled Tremont's knowledge.

### H.    The Adversary Proceeding

The Trustee seeks to recover subsequent transfers aggregating $343,084,590 under section 550(a)(2) of the Bankruptcy Code made to the Defendants by Prime Fund, the initial transferee.[19]  (¶ 335.)  The date and amount of each subsequent transfer is set out in Exhibit C to the *PAC*.  The Trustee has moved for leave to amend the original complaint filed in December 2010, to meet the more rigorous pleading requirements relating to allegations of bad faith imposed by the District Court after that date.

The Defendants oppose the Motion.  They argue, in the main, that the *PAC* does not allege that the Defendants willfully blinded themselves to Madoff's Ponzi scheme and does allege that they gave value to the Prime Fund.  Consequently, the Defendants have a complete defense under 11 U.S.C. § 550(b).  (*Opposition* at 19-34.)  The Defendants also contend that the Trustee's claims violate the "single satisfaction" rule under 11 U.S.C. § 550(d) because the BLMIS estate has already recovered the initial transfers through a settlement with Tremont, (*id.* at 13-16), the transfers to the Prime Fund that were subsequently transferred to the Defendants did not deplete the estate because Prime Fund replaced the Defendants' funds with an alternative source and reinvested those sums with BLMIS, (*id.* at 16-19), and the safe harbor in 11 U.S.C. § 546(e) bars any subsequent transfers originating from initial transfers to the Prime

---

[19]    According to the *PAC*, BLMIS sent approximately $1.01 billion in initial transfers to Prime Fund. Of that amount, the Prime Fund received approximately $945 million within six years of the Filing Date and approximately $495 million within two years of the Filing Date.  (¶¶ 331-33; *accord PAC* at Exhibit A.)

Fund made more than two years before the Filing Date because Prime Fund lacked

actual knowledge that BLMIS was not trading securities. (*Id.* at 34-40.)

## DISCUSSION

### A.    Standards Governing the Motion

Rule 15(a) of the Federal Rules of Civil Procedure governs motions for leave to

amend pleadings. Generally, leave should be freely granted, but the court may deny the

motion in instances of undue delay, bad faith, dilatory motive, undue prejudice to the

opposing party or futility. *Foman v. Davis*, 371 U.S. 178, 182 (1962). The Defendants'

sole contention is that the *PAC* is futile. (*See Opposition* at 1.) "An amendment to a

pleading is futile if the proposed claim could not withstand a motion to dismiss

pursuant to Fed. R. Civ. P. 12(b)(6)." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243,

258 (2d Cir. 2002).

"To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft

v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted); *accord Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *accord

Twombly*, 550 U.S. at 556. It is not sufficient for the complaint to plead facts that

"permit the court to infer . . . the mere possibility of misconduct," *Iqbal,* 556 U.S. at 679;

he must state "the grounds upon which his claim rests through factual allegations

sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v.

Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly,* 550 U.S. at 555).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  The court should assume the veracity of all "well-pleaded factual allegations," and determine whether, together, they plausibly give rise to an entitlement of relief, *id.*, but where the amended pleading directly contradicts the facts alleged in an earlier pleading, the Court may accept the allegations in the original pleading as true. *See Vasquez v. Reilly*, No. 15-CV-9528 (KMK), 2017 WL 946306, at *3 (S.D.N.Y. Mar. 9, 2017); *Colliton v. Cravath, Swaine & Moore LLP*, No. 08 Civ 0400 (NRB), 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008), *aff'd*, 356 F. App'x 535 (2d Cir. 2009).

In deciding the motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007).  The court may also consider documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002); *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir. 1993); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir. 1991), *cert. denied,* 503 U.S. 960 (1992); *McKevitt v. Mueller,* 689 F. Supp. 2d 661, 665 (S.D.N.Y. 2010). Where the complaint cites or quotes from excerpts of a document, the court may consider other parts of the same document submitted by the parties on a motion to dismiss. *131 Main St. Assocs. v. Manko,* 897 F. Supp. 1507, 1532 n. 23 (S.D.N.Y. 1995). If "the documents contradict the allegations of a plaintiff's complaint, the documents

control and the [c]ourt need not accept as true the allegations in the complaint." *2002 Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assurance Co.*, 96 F. Supp. 3d 182, 199 (S.D.N.Y. 2015) (quoting *Bill Diodato Photography LLC v. Avon Prods., Inc.,* No. 12−CV−847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012)) (citing authorities).

Here, the *PAC* relies on and/or quotes from, *inter alia*, the *March 10 Memo*, the *March 30 Memo*, the *Transaction Memo*, the *RCA*, the KPMG Report, and the *Agenda*.

## B.    Claims to Recover Subsequent Transfers

Section 550(a)(2) of the Bankruptcy Code allows the Trustee to recover an avoidable transfer from "any immediate or mediate transferee of" the initial transferee. To plead a subsequent transfer claim, the Trustee must plead that the initial transfer is avoidable, and the defendant is a subsequent transferee of that initial transferee, that is, "that the funds at issue originated with the debtor." *Picard v. Legacy Capital Ltd.* (*In re BLMIS*), 548 B.R. 13, 36 (Bankr. S.D.N.Y. 2016) (*"Legacy I"*); *accord Silverman v. K.E.R.U. Realty Corp.* (*In re Allou Distribs., Inc.*), 379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007).  As noted, the Court assumes that the *Tremont Complaint* as supplemented by the *PAC* alleges that Tremont knew that BLMIS was not actually trading securities and was operating a Ponzi scheme.  Accordingly, the safe harbor, 11 U.S.C. § 546(e), does not apply and the initial transfers are avoidable.  In addition, Defendants have not disputed that the funds that were subsequently transferred to them by Prime Fund originated with BLMIS.

Section 550(b) provides a defense to a subsequent transferee who "[took] for value, . . . in good faith, and without knowledge of the voidability" of the initial transfer. Ordinarily, the transferee must raise the affirmative defense under section 550(b). *Legacy I*, 548 B.R. at 36. In addition, an objective, reasonable person test usually applies to determine a transferee's good faith. *See Marshall v. Picard* (*In re BLMIS*), 740 F.3d 81, 90 n. 11 (2d Cir. 2014) ("The presence of 'good faith' depends upon, *inter alia*, 'whether the transferee had information that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose.'") (quoting *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC* (*In re Bayou Grp., LLC*), 439 B.R. 284, 310 (S.D.N.Y. 2010)). However, in *SIPC v. BLMIS* (*In re BLMIS*), 516 B.R. 18 (S.D.N.Y. 2014) ("*Good Faith Decision*"), the District Court ruled that good faith should be determined under a subjective standard, *id.* at 21-23, and placed the burden of pleading a lack of good faith on the Trustee. *Id.* at 23-24. Before addressing good faith, I briefly consider the other component of Defendants' defense, "value."

### 1.    Value

The burden of pleading lack of value remains on the transferee who is in the better position to identify the value he gave for the subsequent transfer. *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 206 (Bankr. S.D.N.Y. 2018) ("*BNP*"). Where the burden of pleading rests on the defendant, the Court may nevertheless dismiss the claim pursuant to Rule 12(b)(6) if the defense is apparent on the face of the complaint. *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003); *accord Picard v. ABN AMRO Bank (Ireland) Ltd.*, 505

B.R. at 141.  "Value" within the meaning of section 550(b) is "merely consideration sufficient to support a simple contract, analogous to the 'value' required under state law to achieve the status of a bona fide purchaser for value." 5 RICHARD LEVIN & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 550.03[1] at 550–25 (16th ed. 2019); *accord Enron Corp. v. Ave. Special Situations Fund II, LP* (*In re Enron Corp.*)*,* 333 B.R. 205, 236 (Bankr. S.D.N.Y. 2005); KATHY BAZOIAN PHELPS & HON. STEVEN RHODES, THE PONZI BOOK § 4.03[2] at 4-42 (2012).

The *PAC* pleads that the Defendants loaned Prime Fund at least $300 million and Prime Fund or Tremont repaid that loan through the subsequent transfer.  The remaining subsequent transfers coincide with the life of the loan and appear from Exhibit C to the *PAC* to be monthly payments of fees or interest, or both.  Accordingly, the *PAC* pleads that the Defendants gave value in the form of the loan for the subsequent transfers.

### 2.   Knowledge and Good Faith

As stated, the Trustee must plead that the Defendants took the subsequent transfers in good faith and without knowledge of the avoidability of the initial transfer. The two concepts represent separate elements under section 550(b), but they are related.

#### a.   Good Faith

To satisfy his burden of pleading a lack of good faith, the Trustee must allege that each Defendant willfully blinded itself to facts suggesting that BLMIS was not actually

trading securities.[20]  *Good Faith Decision*, 516 B.R. at 22-23; *Picard v. Merkin* (*In re BLMIS*), 563 B.R. 737, 752 (Bankr. S.D.N.Y. 2017).  Willful blindness consists of two elements: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact."  *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) ("*Global-Tech*").  If a person who is not under an independent duty to investigate "nonetheless, intentionally chooses to blind himself to the 'red flags' that suggest a high probability of fraud, his 'willful blindness' to the truth is tantamount to a lack of good faith."  *Picard v. Katz*, 462 B.R. 447, 455 (S.D.N.Y. 2011), *abrogated on other grounds by SIPC v. BLMIS*, (*In re BLMIS*), 513 B.R. 437 (S.D.N.Y. 2014).

Neither recklessness nor negligence constitutes willful blindness.  "[A] reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing, see ALI, Model Penal Code § 2.02(2)(c) (1985), and a negligent defendant is one who should have known of a similar risk but, in fact, did not, see § 2.02(2)(d)."  *Global-Tech*, 563 U.S. at 770.  Acting in the face of a "known risk" does not establish willful blindness.  *Id.*  Furthermore, "deliberate indifference" to the risk does not establish willful blindness.  *See id.*

---

[20]    The Trustee contends that it is sufficient to allege that the Defendants willfully blinded themselves to fraud generally rather than to the fact that BLMIS was not trading securities and was operating a Ponzi scheme.  (*Trustee Reply* at 4-5.)  But the fraud on which the *PAC* relies was BLMIS's operation of a Ponzi scheme.  (¶ 104 ("Throughout the due diligence it conducted in connection with these deals, CGMI recognized indicia of fraud and repeatedly expressed two primary concerns: the first was that BLMIS was not and could not be trading options; the second was that the money invested and left under BLMIS's unfettered control could be stolen and disappear - *two of the fundamental elements of BLMIS's Ponzi scheme*.") (emphasis added).)  *accord Trustee Reply* at 5 ("The Trustee adequately alleges Defendants learned of facts causing them to believe there was a high probability BLMIS was not making trades as purported and misappropriating its customers' assets (*i.e., running a Ponzi scheme*).") (emphasis added).)  The *PAC* does not allege another type of fraud at BLMIS that the Defendants believed was highly probable.

### b.    Knowledge of Avoidability

To plead that a Defendant knew that it was receiving the proceeds of an avoidable transfer, the Trustee must plausibly allege that the Defendant "possess[ed] knowledge of facts that suggest a transfer may be fraudulent." *Banner v. Kassow*, 104 F.3d 352, 1996 WL 680760, at *3 (2d Cir. Nov. 22, 1996) (summary order) (quoting *Brown v. Third Nat'l Bank* (*In re Sherman*), 67 F.3d 1348, 1357 (8th Cir. 1995)). Section 550(b)(1) does not impose a duty to investigate or monitor the chain of transfers that preceded the subsequent transfer, but "[s]ome facts strongly suggest the presence of others; a recipient that closes its eyes to the remaining facts may not deny knowledge." *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 898 (7th Cir. 1988) (Easterbrook, J.). This standard "essentially defines willful blindness which, the District Court has held, is synonymous with lack of good faith." *Legacy I*, 548 B.R. at 38; *see also id.* at 38-39 (noting that some courts and commentators have suggested that the good faith and knowledge elements of 11 U.S.C. § 550(b)(1) are one and the same). Here, the parties have not identified a distinction between the two elements of § 550(b)(1).

### 3.    Allegations of Willful Blindness

### a.    The First Prong

The *PAC* alleges that the Defendants developed a subjective belief in the high probability that BLMIS was running a Ponzi scheme as a result of its due diligence in connection with the three deals.[21] (¶ 104.) These suspicions arose early. The Trustee

---

[21]    I assume for the purposes of analysis that everything that CGMI or its employees learned is imputed to the Defendants.

argued in his briefing that by the time that the Defendants entered into the Prime Fund Deal they already entertained "well-founded suspicions" that BLMIS was not trading securities and was misappropriating assets.  (*Trustee Reply* at 5.)  Not surprisingly, virtually all of the "red flags" the Trustee points to predate the Prime Fund Deal.[22]  (*See* ¶¶ 105-74.)

At oral argument, however, the Trustee's counsel conceded that the Defendants did not entertain a subjective belief in the high probability that BLMIS was a fraud when they loaned $300 million to Prime Fund in June 2005.  (Transcript of 7/18/19 Hr'g ("Tr.") at 16:8-13 (ECF Doc. # 169).)  By then, Defendants had already learned or become aware through their due diligence on the Fairfield and Prime Fund Deals that they could not verify BLMIS's option trades or its option counterparties and BLMIS's role as broker-dealer and custodian raised a risk of fraud and the disappearance of assets in the BLMIS accounts.  (¶¶ 108, 110, 118-20, 125, 126.)  In addition, CGMI had already performed a Quantitative Analysis showing that BLMIS had inexplicably outperformed the S&P 100 Index even though the SSC Strategy presumptively had the same risk profile as the S&P 100 Index.  (¶¶ 145, 146, 149, 150-153.)  Also, Leon Gross

---

[22]    The Trustee cites *In re Optimal U.S. Litig.*, No. 10 Civ. 4095(SAS), 2011 WL 4908745, at *7 (S.D.N.Y. Oct. 24, 2011) in support of his argument that Defendants willfully blinded themselves after critical questions were raised about the risk that Madoff was running a Ponzi scheme but failed to investigate further.  *Optimal* is not apposite.  First, *Optimal* was addressing *scienter* under section 20(a) of the Securities Exchange Act of 1934, not willful blindness.  A plaintiff can plead *scienter* for purposes of section 20(a) by alleging at a minimum that the defendant was reckless, *i.e.,* that it "knew or should have known" that the primary violator was engaging in fraudulent conduct.  *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 307-08 (S.D.N.Y. 2013); *In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910(GEL), 2005 WL 1907005, at *12 (S.D.N.Y. Aug. 8, 2005); *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 417-18 (S.D.N.Y. 2001).  Under *Global-Tech*, recklessness and "should have known" do not satisfy the first prong of willful blindness.  Second, for the reasons described in the text, the Trustee has implicitly conceded that the red flags the Defendants identified in connection with the Fairfield and Prime Fund Deals did not yield Defendants' subjective belief in the high probability that BLMIS was a Ponzi scheme.

had performed his own analysis of BLMIS at the instigation of Harry Markopolos and concluded that "either the returns are not the returns or the strategy is not the strategy," (¶ 155; *Gross Tr.* at 116:13-14), and "that the returns weren't generated by the strategy, they were either generated by something else – that something was amiss there." (¶ 164; *Gross Tr.* at 35:19-22.) Moreover, the traders at CGMI's index options desk and the equity derivatives salespeople had already gone on record that they were unfamiliar with Madoff trading index options. (¶¶ 165-166.) Despite everything that Defendants knew, learned, suspected or concerned them regarding the inability to confirm BLMIS's option trades, the identity of its counterparties, its custody of its assets, the risk of fraud and its improbably consistent returns through a strategy that could not be replicated, the Trustee concedes that the Defendants did not entertain a subjective belief in the high probability that BLMIS was not trading securities when it loaned Prime Fund $300 million.

What did Defendants learn after June 2005 when they closed the Prime Fund Deal? More of the same. CGMI continued to inquire about Madoff's options trading but was unable to confirm from its due diligence starting in March 2005 and continuing through 2006 that it actually took place, (¶¶ 197-98), and could not discover the identity of BLMIS's options counterparties. (¶ 199.) In addition, during the due diligence on the Proposed Tremont Deal, Tremont was unable to satisfy CGMI's concerns that BLMIS maintained segregated customer accounts or that the assets even existed. (¶ 192.) Those concerns were always based on a perceived risk that BLMIS, as the broker-dealer and custodian, could steal the customers' assets; the *PAC* does not allege facts suggesting that the Defendants believed that Madoff was actually stealing customer

assets.  In addition, Tremont forwarded an "Independent Auditors' Report on Internal
Control" and BLMIS's "Statement of Financial Condition" prepared by BLMIS's
auditors, F&H.  The report "did not quell CGMI's fraud concerns," (¶ 196), but these
were the same "fraud concerns" the *PAC* attributes to the Defendants when they entered
into the Prime Fund Deal.

The one additional piece of information Defendants acquired — in March 2006 —
was that there were some price discrepancies between options prices reported by BLMIS
to Fairfield Sentry and those reported by Bloomberg.  (¶ 202.)  In addition, on April 17,
2006, Defendants learned through the KPMG Report about discrepancies, including
price discrepancies, reported by BLMIS.  (¶ 207.)  However, these discrepancies did not
seem to matter much; the insurmountable obstacles remained the option trades, the
identity of the counterparties and the concern that Madoff could steal the assets.  These
were the subjects that Defendants wanted to discuss with FGG, (*see* ¶¶ 208-15), and
"[w]hile the April 20, 2006 meeting with FGG 'did not raise any new flags,' . . . 'it did not
give us [CGMI] the answer we were looking for.'"  (¶ 216.)  On April 20, 2006, shortly
after CGMI left the due diligence meeting with FGG without having resolved any of their
concerns, it informed Tremont that Defendants could not proceed with the Proposed
Tremont Deal.  (¶ 225.)

I stop here because the Trustee's counsel also conceded at oral argument that the
Trustee could not establish the second element of willful blindness prior to April 20,
2016, when Tremont allegedly told the Defendants that their concerns with fraud at
BLMIS were insurmountable roadblocks.  (Tr. at 4:5-25; *see Trustee Reply* at 9 ("After
learning of the high probability of fraud at BLMIS, by April 20, 2006, Defendants

ceased their efforts to verify BLMIS was making its purported trades.").) According to the *PAC*, CGMI was leery of meeting with Madoff because it had already concluded there was a high probability of fraud at BLMIS and a meeting with Madoff could jeopardize the Defendants' existing deals because it would confirm the fraud and "upset or spook Madoff." (¶ 231.) The Prime Fund Deal was set to expire in December 2006, and the Defendants and CGMI were prepared to renew the Prime Fund Deal without any further due diligence contingent, however, on a review of Tremont's audited financial statements for 2004 and 2005, (¶ 238), which the *PAC* implies were never forthcoming.

### b.    The Second Prong

The second element of willful blindness involves deliberate efforts to avoid learning the truth. "Deliberate indifference" is not enough, but the *PAC* does not even allege that. Rather, it alleges CGMI's continuing efforts to confirm the option trades and the segregation of assets, its two concerns. Furthermore, although the Trustee argues that he satisfied the second prong on and after April 20, 2006 because the Defendants abandoned any efforts to confirm their suspicions that BLMIS was a fraud, and only attended a subsequent, *pro forma* meeting with Madoff in November 2006 as a check-the-box exercise to justify a foregone conclusion, the *PAC* alleges the Defendants' continuing due diligence and the original complaint contradicts the Trustee's contention.

According to the *PAC*, CGMI renewed its interest in meeting with Madoff based on concerns raised by Tremont's inability to provide audited financial statements. (¶ 241.) Tremont asked CGMI to send a list of proposed questions. In response, CGMI sent Tremont a proposed due diligence agenda that did not expressly ask "any questions

concerning CGMI's two primary concerns of fraud at BLMIS, namely details regarding options trades and verification of the assets."  (¶ 245.)

CGMI and Madoff met on November 27, 2006 but the *PAC* downplays the significance of the meeting alleging that CGMI was no longer interested in getting answers to the questions it had raised, (¶ 248), and sent three people, Thomas Fortuna, Bruce Clark and Nicholls, to the meeting who, "upon information and belief . . . had a direct economic interest in renewing and increasing the Prime Fund Credit Deal."  (¶ 250.)  The *PAC* describes the meeting with Madoff as a "check-the-box exercise," (¶¶ 241, 251), suggesting that CGMI had already decided to renew the Prime Fund Deal and the meeting was window dressing.  (*See* ¶ 251 ("[T]hree days before the meeting took place, CGMI had already instructed its lawyers to draft the requisite renewal and increase documentation for the Prime Fund Credit Deal.").)  Shortly after the meeting, the Defendants renewed the Prime Fund Deal for one month from November 30, 2006 to December 29, 2006, and subsequently renewed it for another year to December 13, 2007 with an increase in the limit from $300 million to $400 million.  (¶ 252.)

The Trustee's original complaint, (*Complaint*, dated Dec. 8, 2010 ("*Complaint*") (ECF Doc. #1-1)), pleads a different story.  As the maturity date for the Prime Fund Deal approached, Tremont asked the Defendants to renew the Prime Fund Deal and increase the facility from $300 million to $400 million.  (*Complaint* ¶ 77.)  To satisfy the Defendants' prior due diligence request, in August 2006, Tremont provided the Defendants with the 2004 and 2005 *audited* financial statements.[23]  (*Complaint* ¶ 79.)

---

[23]    The Trustee's brief acknowledges that Tremont delivered audited financial statements, (*Trustee Reply* at 10), but the *PAC* does not mention it.

The *PAC* alleges that CGMI wanted to meet with Madoff because Tremont was unable to provide audited financial statements, (¶ 241), but CGMI continued to press for a meeting with Madoff even after it received the audited financial statements.[24]   In the face of their own due diligence concerns, the Defendants agreed to extend the facility until November 30, 2006 and table the issue of increasing it by $100 million "until it got comfortable that its due diligence questions were satisfactorily resolved." (*Complaint* ¶ 77.)  One of the conditions to extending and increasing the credit facility was a meeting with Madoff.  (*Complaint* ¶ 77.)

The meeting with Madoff took place on November 27, 2006.  Far from the pretextual meeting described in the *PAC*, the original complaint alleges that "[f]ollowing the meeting with Madoff, Citi not only decided against extending additional credit to Tremont, upon information and belief, it also made a high-level decision to terminate the Prime Fund loan." (*Complaint* ¶ 83.)  Obviously, the import of these allegations, which I credit, is that the Defendants held a substantive meeting with Madoff as a condition to extending and increasing the credit facility, Madoff was unable to satisfy their concerns, and as a consequence, they decided at that point to terminate the Prime Fund Deal.[25]  The original complaint does not indicate what changed the Defendants' mind after the meeting, initially to extend the credit facility for one month and then to extend it for another year and increase it by $100 million.

---

[24]    The *PAC* also implies that CGMI cancelled the April 26 meeting with Madoff after it terminated the Proposed Tremont Deal, a meeting it did not want in the first place.  The original complaint alleged that Tremont cancelled the meeting.  (*Complaint* ¶ 76.)

[25]    This also contradicts the *PAC*'s allegation that the Defendants did not want to meet with Madoff because they were afraid of "upsetting" and "spooking" him and losing business.

In light of the foregoing, the Court concludes that the *PAC* fails to allege anything more than that the Defendants assumed the "remote" risk that BLMIS was not trading securities and might be a fraud and at most, were reckless and deliberately indifferent to that risk.  The Trustee concedes that the due diligence conducted in connection with the Fairfield and Prime Fund Deals did not raise the subjective belief in the high probability that BLMIS was a fraud, *i.e.*, operating a Ponzi scheme.   Furthermore, the *PAC* does not allege that they learned anything more regarding their principal concerns relating to the segregation of assets and option trading after they closed the Prime Fund Deal.

The Defendants continued to conduct due diligence after the April 20, 2006 meeting with FGG.  The original complaint alleges that after CGMI received Tremont's audited financial statements it still insisted on meeting with Madoff, and was only willing to extend the Prime Credit Deal until the end of November 2006.  CGMI met with Madoff in November 2006, and according to the original complaint, it was a substantive meeting that led to the initial conclusion not to renew the Prime Fund Deal. The Defendants nevertheless extended it briefly and increased the facility, but the Prime Fund Deal ultimately terminated when, according to the *PAC*, Tremont refused to continue the Tremont Indemnity.

Plainly, the original complaint alleges that the Defendants did not turn a blind eye to their concerns and continued to pursue answers, insisting on a meeting with Madoff as part of their due diligence.  The Trustee nevertheless contends that the Defendants took deliberate actions to avoid learning the critical facts surrounding Madoff's Ponzi scheme by "consciously decid[ing] to act without confirming them." (*Trustee Memo* at 28 (quoting *United States v. Fofanah*, 765 F.3d 141, 150 (2d Cir.

2014) (Leval, J., concurring.)  This argument equates recklessness with willful blindness and eviscerates the distinction between "deliberate actions to avoid learning" facts, *Global-Tech v. SEB*, 563 U.S. at 769, and "deliberate indifference."  Under the Trustee's formulation, a person who acts in the face of a known risk he cannot confirm despite his best efforts is willfully blind.  However, the defendant that is deliberately indifferent to a known risk and acts anyway is not willfully blind under *Global-Tech*.

### 4.   Implausibility

In the end, the notion that the Defendants would loan Prime Fund $300 million and increase the loan by $100 million at a time when they entertained a subjective belief in the high probability that BLMIS was an illegal, criminal enterprise is utterly implausible.  The Trustee concedes the "facial appeal" of this argument , (*Trustee Reply* at 1), but it is not just facially appealing.  In *Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A.* (*In re M. Fabrikant & Sons, Inc.*), 480 B.R. 480 (S.D.N.Y. 2012), *aff'd*, 541 F. App'x 55 (2d Cir. 2013), then-District Judge Sullivan characterized a similar argument as "nonsensical" and "bordering on the absurd."  *Id.* at 489.  There, the defendant banks (the "Banks") made prepetition secured loans to two entities that operated a jewelry business (the "Debtors").  *Id.* at 483-84.  The Debtors then allegedly transferred the loan proceeds to entities unaffiliated with the Debtors but affiliated with and owned and controlled by the Debtors' owners, the Fortgangs (the "Affiliates"), *id.* at 484, leaving the Debtors with encumbered assets but without the loan proceeds.

In subsequent litigation commenced against the Banks to avoid the Banks' loans and liens, the unsecured creditors committee sought to collapse the first leg of the transaction (the Banks' loans to the Debtors) with the second leg (the Debtors' transfer

of the loan proceeds to the Affiliates) under the collapsing principles discussed in *HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1995), contending that the Banks knew or should have known that the loans were part of a fraudulent scheme by which the Debtors would transfer the loan proceeds to the Affiliates.[26]  According to the plaintiff, the Banks were aware of the Debtors' poor financial condition, the transfers to the Affiliates, the Affiliates' lack of any relationship to the Debtors and the poor loan documentation.  *Id.* at 488-89.  They nevertheless made loans to raise their profiles and earn commissions.  After this Court dismissed the complaint for failure to state a claim, the plaintiff appealed.

Judge Sullivan affirmed, stating that the plaintiff's theory "requires an inference that is highly implausible, bordering on the absurd":

> In essence, [the plaintiff] alleges that the Banks took the massive risk of continuing their lending relationships with the [Debtors and Affiliates] on the speculative hope that there may be sufficient liquidity in the 'Fabrikant Empire' . . . as a whole to enable the Banks to obtain repayment through personal guarantees and other pressure.  Such an assertion would be nonsensical if the Banks were in fact aware that Debtors and the Affiliates had to use the same dollars to repay separate obligations.  *Put simply, drawing all inferences in favor of the [plaintiff], it is difficult to see what benefit the Banks could hope to obtain by lending ever-larger amounts of money to failing companies.  The [complaint's] wholly conclusory allegations that the Banks were clouded in judgment due to lavish commissions is equally implausible, since the loss of principal would have far outweighed the commissions earned on the loans[.]*

*Id.* at 489 (record citations and corresponding quotation marks omitted) (emphasis added).

---

[26]    Following the confirmation of the chapter 11 plan, the GUC Trustee was substituted for the committee as the plaintiff.

More recently, this Court reached the same conclusion in a case that bears striking similarities to the present one.  In *BNP*, 594 B.R. 167, the Trustee brought fraudulent transfer claims against a bank that provided leverage to feeder funds and other entities that invested in BLMIS.  The bank received roughly $156 million in subsequent transfers from various Tremont funds, including Prime Fund, in repayment. *Id.* at 185.  Summarizing the Trustee's theory, the Court explained:

> The crux of the Trustee's argument is that the Defendants engaged in the leverage business while entertaining a belief that there was a high probability that BLMIS was not actually trading securities, the reported BLMIS trades were fictitious and their collateral was therefore fictitious, and their obligors' sole assets, at least in the case of feeder funds fully invested with BLMIS, were non-existent. The reason: the Defendants wanted to earn fees, "to establish their reputation as a leverage provider in a highly-competitive market, to grow the brand of BNP Paribas's Fund Derivatives Group, to compete with its biggest rival, SocGen, and to cross-sell services to BNP Paribas's institutional clients." (¶ 139.) In other words, BNP Bank made billions of dollars of risky and possibly uncollectible loans to those investing with BLMIS or BLMIS feeder funds in order to make tens of millions of dollars in fees and build its profile.

*Id.* at 202.

Relying on *Fabrikant*, the Court rejected the claim as implausible:

> The Defendants' ability to collect on whatever leverage BNP Bank extended to direct investors in BLMIS or investors in BLMIS feeder funds ultimately depended on the value of the BLMIS investments.  If BLMIS was a Ponzi scheme, the securities listed in the BLMIS customer statements were non-existent and BNP Bank's collateral was as worthless as its borrowers' investments in BLMIS or a BLMIS feeder fund. According to the PAC, BNP Bank nonetheless engaged in billions of dollars of risky transactions, including loans and extensions of credit that ultimately depended on the value of BLMIS accounts, to earn "tens of millions of dollars in fees and interest payments," (¶ 64), and raise BNP Bank's position as a world leader in the fast-moving derivatives market.  (¶ 151.)  This theory is as preposterous as the scheme alleged by the plaintiff in *Fabrikant*, and it is implausible to suggest that the Defendants would make loans or engage in the transactions described in the PAC if they subjectively believed that there was a high probability that BLMIS was not actually trading securities.

*Id.* at 203-04 (footnote omitted).

The *PAC* implies that the Defendants entered into the Prime Fund Deal to earn interest and fees.  (*See* ¶¶ 176, 256.)  The interest and fees aggregated approximately $43 million over the roughly three year life of the loan.  (*See PAC*, Ex. C; *accord Trustee Reply* at 2.)  The idea that the Defendants would loan $400 million to a borrower to invest the proceeds in a criminal, fraudulent enterprise in order to earn between $14 million and $15 million in annual fees and interest is absurd for the same reasons discussed in *Fabrikant* and *BNP*.

Furthermore, it is equally implausible for the same reasons that Defendants would ignore BLMIS's fraud if they subjectively believed in the high probability that BLMIS was a fraud.  A court may consider a defendant's motive for shutting its eyes to a subjective belief in a high probability of fraud.  *See Global-Tech*, 563 U.S. at 771 ("[W]e cannot fathom what motive Sham could have had for withholding this information other than to manufacture a claim of plausible deniability in the event that his company was later accused of patent infringement."); *Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 365 (S.D.N.Y. 2001) ("Nor is there any pleading of a motive for deliberately remaining ignorant of the facts in question to render any plausible suggestion of a characterization of willful blindness."); *In re Fischbach Corp. Sec. Litig.*, No. 89 CIV. 5826 (KMW), 1992 WL 8715, at *6 (S.D.N.Y. Jan. 15, 1992) ("[P]laintiff has not alleged that defendants had any motive for deliberately shutting their eyes to the facts, and, indeed, the defendants had no interest in being defrauded, and thus, obviously had no interest in remaining ignorant that they were in the process of being defrauded.").  The Defendants had no motive to turn a blind eye to the BLMIS Ponzi scheme and agree to add an additional

$100 million in credit to the outstanding $300 million in order to earn the fees and interest that they did.

The Trustee argues that the Defendants were nevertheless willing to lend up to $400 million to Prime Fund to invest with BLMIS "because Defendants were not exposed to that risk. Defendants were indemnified, allowing them to enter into the transaction and earn their fees—$43 million dollars in three years—without fear of losing," (*Trustee Reply* at 2), because the Tremont Indemnity was the "primary mitigant" of fraud by BLMIS. (*See Trustee Memo* at 1 ("During the diligence process, Defendants became concerned that BLMIS was not trading securities as it purported to do and was instead misappropriating its customers' assets. Instead of investigating these concerns, Defendants obtained an indemnification from Prime Fund's general partner, Tremont Partners, protecting them against fraud by BLMIS. Once indemnified, Defendants refused to act on their suspicions of fraud at BLMIS even when confronted with more and more evidence that, as would soon become known to the world, BLMIS was fabricating trades and misappropriating assets."); *accord id.* at 10 ("The indemnity enabled Defendants to turn a blind eye to their well-founded suspicions of fraud at BLMIS."); ¶ 186 ("The indemnity enabled Defendants to turn a blind eye to the substantiated fraud risk at BLMIS while repeatedly renewing and increasing the Prime Fund Credit Deal.").)

The Trustee misunderstands the significance of the Tremont Indemnity and the distinction between Tremont and TCM. According to the *Transaction Memo* which the *PAC* quotes but only in part, the "primary mitigant" of the "remote" risk of BLMIS's fraud was "an indemnity from the General Partner *supported by a Parent Guarantee*

from TCM." (*Transaction Memo* at 3 (emphasis added); *accord id.* at 6 ("The Global

Credit Center and Global Portfolio Management unit will co-approve 10%, $30MM, in

Seller Risk to recognize the unique reliance on the General Partner's indemnity and the

Parent Guarantee from TCM.").) The Tremont Indemnity, standing alone, did not

provide any additional financial security. The *Transaction Memo* recognized that as a

Delaware limited partnership, Tremont, the general partner, was already liable for

Prime Fund's debts, (*Transaction Memo* at 6 (citing RULPA § 17-403)), "regardless of

whether [Prime Fund's] failure to make any such payments resulted from market value

declines, fraud or other malfeasance by any party, including the Investment Advisor, the

failure to comply with the Investment Strategy, or *any* other reason." (*Id.* (emphasis in

original); *accord id.* at 7 ("Under the Credit Agreement, the Fund and the General

Partner have agreed pursuant to the indemnification provision that they are jointly and

severally liable for all losses, liabilities and damages arising out of or in connection with

the Facility, including, without limitation (i) any breach or alleged breach of any

covenant by the Fund, the General Partner or the Investment Advisor. . . .").) The

benefit of the Tremont Indemnity was procedural; it allowed Defendants to sue Tremont

without first exhausting its remedies against Prime Fund as otherwise required by

RULPA. (*Id.* at 7.)

The Parent Guarantee would have guaranteed Tremont's obligations, "with the

exception of the obligation to support the Fund's failure to repay Advances that resulted

from a decline in the fair market value of the assets purchased in adherence to the

Investment Strategy." (*Id.* at 7; *accord id.* at 5 ("As more fully set forth below, the

General Partner will be liable for all of the payment obligations of the Fund, which, with

the exception relating to the Fund's failure to repay advances under the Facility due to a decline in the fair market value of the assets purchased in adherence to the Investment Strategy, will be supported by a Parent Guarantee from TCM.").)  The *PAC* incorrectly attributes this limit on indemnity to the Tremont Indemnity rather than the Parent Guarantee.  (*See* ¶¶ 7, 182.)

Not surprisingly, the *Transaction Memo* focused on TCM's financial wherewithal. The *Transaction Memo* sometimes referred to Tremont Partners and TCM collectively as "Tremont," (*Transaction Memo* at 2), but Appendix A to the *Transaction Memo* zeroed in on the financial strength of TCM.  (*See id.* at 11 ("Tremont Capital Summary Financials").)  It was TCM, not Tremont the general partner, that was "a diversified, global alternative investment manager concentrating on investment fund management and development, consultancy, and database sales and information services."  (*Id.* at 9.) It was TCM, not Tremont, that was a wholly-owned subsidiary of OFI and had an obligor risk rating of 4, (*id.* at 2; *see id.* at 9), with $13 billion in alternative investments, (*see id.* at 9 ("Tremont was established in 1984 and currently advises more than U.S.$13 billion in alternative investments."); *id.* at 12 (bar graph showing "Tremont Capital Assets under Management" in excess of $13 billion as of the first quarter of 2005).)  It was TCM, not Tremont, that "as a subsidiary of OFI, generates strong cash flows with little need for debt financing," and when it needed funding, "OFI has provided inter-company loans at attractive rates."  (*Id.* at 10.)

In contrast, the *Transaction Memo* did not discuss the financial condition of Tremont, the general partner.  Tremont's entire financial model was built on investments with BLMIS.  It served as general partner to the Prime Fund and the other

Rye Funds and as investment manager to the Rye Funds as well as a group of sub-feeder funds.[27]  If BLMIS was a Ponzi scheme, its general partner interests would be worthless and its lucrative investment fees would end.  The Tremont Indemnity only had value if BLMIS stole Prime Fund's assets but not the assets of the other Rye Funds, an unlikely scenario if BLMIS was actually operating as a Ponzi scheme.  In fact, "Tremont's profitability and, as it turned out, its very existence, depended on BLMIS."  (¶ 319.)  The Trustee argues that the Defendants did not know this at the time but in light of Tremont's business model, they could not have known otherwise.   That the Defendants ultimately closed the Prime Fund Deal and subsequently extended it solely on the strength of the Tremont Indemnity implies the opposite of what the Trustee contends: the Defendants did not believe that BLMIS was a fraudulent operation.

The *PAC* also incorrectly suggests that the Defendants ultimately refused to renew the Prime Fund Deal because Tremont would not extend the Tremont Indemnity:

> For the first time [in October 2007], Tremont proposed to renew the credit facility, but without the terms CGMI had previously acknowledged were the "primary mitigant of fraud" for Defendants and CAFCO.  Without such an indemnification, the extent of Defendants and CAFCO's recovery under the Prime Fund Credit Deal in the event of fraud at BLMIS would be limited to Prime Fund's assets.  This was unacceptable to Defendants because they subjectively believed there was a high probability of fraud at BLMIS in that it was misappropriating these assets.

(¶ 254; *accord* ¶¶ 258-60.)

---

[27]    The Trustee incorrectly states, "that at the time they entered into the indemnification, Defendants believed that Tremont Partners was invested with hundreds of asset managers and in at least a dozen different strategies."  (*Trustee Reply* at 1.)  This describes TCM.  Tremont's only strategy was to raise money from investors, turn the money over to BLMIS and collect fees for "managing" that investment.

In the first place, the "primary mitigant of fraud" was the Tremont Indemnity backed by the Parent Guarantee, not the Tremont Indemnity standing alone.  More important, the Trustee confuses a loan minus the Tremont Indemnity with a non-recourse loan.  Even without the Tremont Indemnity, Tremont was liable for the repayment of the credit facility under RULPA.  Tremont refused to renew the Prime Fund Deal unless it was non-recourse, *i.e.* without contractual, statutory or common law recourse against Tremont.  As the *PAC* makes clear, "the 'limited recourse issue' referred to Tremont's demand to remove the Tremont Partners indemnification from the Prime Fund Credit Deal *and include a provision specifically stating that Defendants and CAFCO would have 'no recourse' against Tremont Partners for any obligations Prime Fund owed to them.*" (¶ 255 (emphasis added).)

In the end, the Trustee's response to the otherwise implausible notion that the Defendants would agree to lend up to $400 million to invest in a venture they subjectively believed was probably a Ponzi scheme is based on a misunderstanding of the Tremont Indemnity as the "primary mitigant of fraud."  The Trustee misreads the *Transaction Memo*, misunderstands the scope of Tremont's liability without the Tremont Indemnity and confuses Tremont and TCM.  Given Tremont's dependence on BLMIS, the Defendants' willingness to enter into the Prime Fund Deal and renew and increase it by $100 million through March 2008 solely on the strength of the Tremont Indemnity implies that they considered the risk of fraud to be "remote," precisely what the *Transaction Memo* stated.

Accordingly, the Trustee's motion for leave to amend his original complaint is denied.  In light of this determination, the Court does not address the other arguments

raised by the Defendants in opposition to the motion for leave to amend.  Settle order on notice.

Dated:  New York, New York
        October 18, 2019

/s/*Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Court